## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**ATTORNEY FOR APPELLANT**

Patrick A. Duff
Evansville, Indiana

**ATTORNEY FOR APPELLEE**

Allyson R. Breeden
Ziemer Stayman Weitzel & Shoulders, LLP
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Adoption of L.M.Q.,

C. Q.,

*Appellant-Respondent,*

v.

J. G. and M. G.,

*Appellees-Petitioners.*

May 13, 2015

Court of Appeals Case No. 82A01-1409-AD-391

Appeal from the Vanderburgh Superior Court.

The Honorable Renee Ferguson, Magistrate.

Cause No. 82D07-1211-AD-167

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, C.Q. (Father), appeals the adoption of his minor son, L.Q. (Child), by Appellees-Petitioners, J.G. and M.G. (collectively, Adoptive Parents).

We affirm.

## ISSUE

Father raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred in determining that Father's consent to the Child's adoption was not required.

## FACTS AND PROCEDURAL HISTORY

On February 8, 2010, the Child was born to J.F. (Mother)[1] and Father in Newburgh, Warrick County, Indiana. Father was not present for the Child's birth as he was serving an eighteen-month sentence in the Indiana Department of Correction (DOC) for a Class C felony conviction of stalking. While incarcerated, on March 12, 2010, Father executed a paternity affidavit claiming to be the Child's biological father. No order for child support was ever entered.

At birth, the Child was diagnosed with microcephaly, a neurological disorder that results in abnormal brain development. As a result of his condition, the

---

[1] On November 27, 2013, the trial court entered a default judgment against Mother, finding that her consent was not necessary for the Child's adoption. Mother is not a party to this appeal, but relevant facts with respect to her are included where appropriate.

Child suffers from a number of developmental, cognitive, and behavioral issues for which he requires constant supervision, medication, and various types of therapy, among other special needs. For the first six months of his life, Mother was the Child's sole custodian. During this time, Mother and the Child, along with the Child's half-sister, C.F., lived with various relatives, including Father's mother, D.S. (Paternal Grandmother). In May of 2010, Mother, C.F., and the Child moved in with Mother's father and step-mother—*i.e.*, Adoptive Parents.

[6] At some point, Mother left the Child in the care of Paternal Grandmother. Then, on August 8, 2010, Father was released from prison, and he moved in with Paternal Grandmother and the Child, eventually taking over the role of the Child's primary caretaker. Three months later, on November 20, 2010, Mother—accompanied by several police officers—appeared at the Child's doctor's appointment and removed the Child from Father's custody. When Mother subsequently moved out of Adoptive Parents' home, she left the Child in Adoptive Parents' care.

[7] Adoptive Parents filed a petition for guardianship over the Child, and on July 1, 2011, the trial court appointed them as temporary guardians. On July 6, 2011, Father appeared at a hearing on the guardianship, but he did not object to the Adoptive Parents' appointment or request parenting time. On October 4, 2011, the trial court appointed Adoptive Parents as the Child's permanent co-guardians. For six months thereafter, per an informal agreement with Adoptive Parents, Father exercised parenting time with the Child every other weekend.

[8] In March of 2012, Father was charged with battery with a deadly weapon. Before he could be arrested, Father absconded and remained "on the run" until he was apprehended in August of 2012 and confined to the Vanderburgh County Jail. (Appellant's App. p. 43). At the end of October of 2012, Father posted a $2,000 bond and was released from jail. During the seven-month period that Father was either a fugitive or incarcerated, he did not have any contact with the Child. Although he called Adoptive Parents a few times, Father did not speak to or inquire about the Child; rather, he demanded that Adoptive Parents pay him half of the tax refund that they received as the Child's guardians.

[9] Shortly after bonding out of jail—just a few days prior to Halloween 2012— Father appeared at Adoptive Parents' apartment and waited until they brought the Child outside. Father spent about twenty minutes visiting with the Child and requested that he be able to resume his prior parenting time schedule. Adoptive Parents informed him that they would have to discuss the matter with their attorney, and at their counsel's advice, Adoptive Parents notified Father that he could no longer have overnight visits with the Child. In response, Father became belligerent and shouted obscenities at Adoptive Father. Over the next few weeks, Father called Adoptive Parents between two and four times to argue about the Child's custody. Ultimately, Adoptive Parents indicated that the matter would have to be resolved in court, and Father stated that he would hire an attorney to sue for custody. Following these conversations, Adoptive Parents changed their home phone number; however, they maintained the same

cell phone number, which is the number that Father used to contact them. Since his brief visit in October of 2012, Father has not requested parenting time or otherwise attempted to visit or communicate with the Child by any means.

[10] On November 8, 2012, Adoptive Parents filed a verified petition to adopt the Child. In their petition, Adoptive Parents alleged that Father's consent to the adoption was unnecessary based on his abandonment of the Child and his failure to communicate with or provide any support for the Child for more than one year. On November 28, 2012, Father filed his objection to the adoption.

[11] On December 9, 2013, and January 3, 2014, the trial court conducted a hearing on the matter of Father's consent to Adoptive Parents' adoption of the Child. On March 6, 2014, the trial court ruled that Father's consent was not required because Father "failed to communicate significantly with [the Child] for a period of at least one year[,]" and he "knowingly and voluntarily failed to provide for the care and support of [the Child] despite his ability to do so." (Appellant's App. pp. 49, 51). On August 28, 2014, the trial court granted Adoptive Parents' petition to adopt the Child.

[12] Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[13] In matters of family law, Indiana courts have long recognized that the trial court "is in the best position to judge the facts, determine witness credibility, get a feel for the family dynamics, and get a sense of the parents and their

relationship with the children." *E.W. v. J.W.*, 20 N.E.3d 889, 894 (Ind. Ct. App. 2014), *trans. denied*. Accordingly, in an adoption case, our court will not disturb the trial court's ruling "unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion." *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). On review, we do not reweigh the evidence, and we consider the evidence and all inferences reasonably derived therefrom in a light most favorable to the trial court's ruling. *In re Adoption of K.S.*, 980 N.E.2d 385, 387 (Ind. Ct. App. 2012). We presume that the trial court made the correct decision, and the appellant bears the burden of overcoming this presumption. *In re Adoption of S.W.*, 979 N.E.2d 633, 639 (Ind. Ct. App. 2012).

[14] In addition, because the trial court issued special findings of fact and conclusions thereon, our review is further governed by Indiana Trial Rule 52(A), which provides that "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Thus, "we must first determine whether the evidence supports the findings and second, whether the findings support the judgment." *In re Adoption of T.L.*, 4 N.E.3d at 662. Findings of fact "are clearly erroneous if the record lacks any evidence or reasonable inferences to support them [and] . . . a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings." *Id.* (alterations in original).

Father claims that the trial court erred when it determined that his consent to the Child's adoption was not required. Indiana's adoption statute provides, in pertinent part, that upon the finding that adoption would be in the best interest of a child and that "proper consent, if consent is necessary, to the adoption has been given[,]" the trial court shall grant a petition for adoption. Ind. Code § 31-19-11-1(a)(1),(7). In any adoption proceeding, the natural parent is entitled to the most protected status. *In re Adoption of K.S.*, 980 N.E.2d at 387. As such, if paternity has been established, both parents must execute written consent for the adoption to proceed. *See* I.C. § 31-19-9-1(a)(2)(B). However, consent is not required from the

> parent of a child in the custody of another person if for a period of at least one (1) year the parent:
> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

I.C. § 31-19-9-8(a)(2). The party petitioning for adoption bears the burden of proving that the parent's consent to the adoption is unnecessary by clear and convincing evidence. *In re Adoption of M.B.*, 944 N.E.2d 73, 77 (Ind. Ct. App. 2011).[2]

---

[2] We note that both parties indicated that Adoptive Parents' burden of proof in this case is that of clear, cogent, and indubitable evidence. However, our court has previously determined that the clear, cogent, and indubitable evidence standard "creates inconsistent burdens across the different statutory bases for adoption." *In re Adoption of M.B.*, 944 N.E.2d at 77. We have resolved "that the burden of proof for an adoption without

## A. *Failure to Communicate with the Child*

First, Father contends that the trial court erroneously found that he failed to communicate significantly with the Child for a period of at least one year. In order to dispense with parental consent, the petitioner for adoption must prove both a lack of communication for the statutory period and that the parent had an ability to communicate during that time. *See Rust v. Lawson*, 714 N.E.2d 769, 772 (Ind. Ct. App. 1999), *trans. denied*. On appeal, we must consider the facts and circumstances of the particular case, including, for example, "the custodial parent's willingness to permit visitation as well as the natural parent's financial and physical means to accomplish his obligations." *Id.* Furthermore, any efforts by the custodial party "to hamper or thwart communication between parent and child are relevant in determining the ability to communicate." *Id.* The "significance of the communication is not measured in terms of units of visits[,]" so the natural parent must have made "more than 'token efforts'" to communicate with his child. *E.W.*, 20 N.E.3d at 896; *Rust*, 714 N.E.2d at 772 (quoting I.C. § 31-19-9-8(b)). The purpose of this provision "is to encourage non-custodial parents to maintain communication with their children and to discourage non-custodial parents from visiting their children just often enough to thwart the adoptive parents' efforts to provide a settled environment for the children." *In re Adoption of C.E.N.*, 847 N.E.2d 267, 272 (Ind. Ct. App. 2006).

---

consent, under any of the subsections in [Indiana Code] section 31-19-9-8, is that of 'clear and convincing evidence.'" *In re Adoption of S.W.*, 979 N.E.2d at 640.

[17] In this case, Father argues that the trial court failed to consider the fact that Adoptive Parents "acted as a road block to dismantle all communication between [him] and [the Child]." (Appellant's Br. p. 11). In turn, Adoptive Parents assert that the trial court properly ruled that Father's consent was not required because his "last *meaningful* communication and visit with [the Child] was sometime [in] March 2012 before he went 'on the run' seeking to avoid arrest on a felony charge." (Appellees' Br. p. 6) (footnote omitted). We find it unnecessary to address whether Adoptive Parents thwarted Father's efforts to communicate with the Child because the evidence and findings do not support the trial court's determination that Father failed to communicate for the requisite period of time.

[18] The trial court acknowledged—and the parties agree—that Father exercised parenting time with the Child on alternating weekends from October of 2011 through March of 2012. Thereafter, Father's sole communication with the Child was a twenty-minute visit after he was released from jail. As the trial court found, "[t]he undisputed evidence demonstrates . . . that [Father] has failed to communicate significantly with [the Child] since March of 2012." (Appellant's App. p. 10).

[19] In determining whether a parent has failed to significantly communicate with his child for the statutory one-year period, our court has previously noted that a "parent's conduct *after* the petition to adopt was filed is wholly irrelevant." *In re Adoption of S.W.*, 979 N.E.2d at 640 n.3 (internal quotation marks omitted). Here, Adoptive Parents filed the petition for adoption on November 8, 2012—

*i.e.*, only eight months after Father's last meaningful interaction with the Child. Therefore, the trial court erroneously concluded that Father failed to significantly communicate with the Child for at least one year. Nevertheless, because Indiana Code section 31-19-9-8(a)(2) is "framed in the disjunctive[,]" Adoptive Parents may still satisfy their burden by establishing that Father failed to provide for the Child's care and support. *In re Adoption of J.P.*, 713 N.E.2d 873, 875 (Ind. Ct. App. 1999).

## B. *Failure to Provide for the Child's Care and Support*

[20] Father next contends that the trial court erred in finding that he failed to provide for the Child's care and support for at least one year. Indiana law imposes a duty upon a parent to support his children, and "[t]his duty exists apart from any court order or statute." *Irvin v. Hood*, 712 N.E.2d 1012, 1014 (Ind. Ct. App. 1999). Approximately one month after the Child was born, Father signed a paternity affidavit acknowledging that he is the Child's biological father, thereby establishing his legal duty to support the Child. *See* I.C. § 16-37-2-2.1(j)(2) (stating that the execution of a paternity affidavit "gives rise to parental rights and responsibilities[,]" including child support).

[21] The evidence reveals that Father has never paid any monetary support on behalf of the Child. Nonetheless, our court has previously found "that a parent's nonmonetary contribution to a child's care may be counted as support." *E.W.*, 20 N.E.3d at 897. In accordance with his parenting time arrangement with Adoptive Parents, Father provided food, diapers, and other necessary items while the Child was in Father's care. Accordingly, Father now

insists that "[t]he record is clear that [he] was providing a constant and continuous means of both financial and emotional support for the [Child] up to the point that [Adoptive Parents] ended all contact [that Father] would have with the [Child]." (Appellant's Br. p. 13). Because Adoptive Parents denied his weekend parenting time following his release from jail, Father posits that "he was not given the opportunity to continue providing support by the means that the parties[] had previously agreed upon." (Appellant's Br. p. 14). We disagree.

[22] Regarding the matter of child support, the trial court specifically found:

> 60. Since [the Child] has been in the care and custody of [Adoptive Parents], [Father] has never provided [Adoptive Parents] with any monetary support or other tangible property to help support [the Child].
>
> 61. Although [Father] testified that he provided [the Child] with food, diapers, and wipes during his parenting time when he was getting parenting time with [the Child] every other weekend, this parenting time schedule stopped in March 2012 and since then [Father] has provided no financial support to [Adoptive Parents] in any form for their care of [the Child].
>
> 62. Although [Father] claimed to have bought [the Child] a Christmas present in 2012 and to have prepared an Easter basket for him in 2013, neither of those gifts were ever given to [Adoptive Parents] to give to [the Child].

(Appellant's App. pp. 46-47). Notwithstanding whether Father's provision of food and diapers during his parenting time was sufficient to satisfy his support obligation, the trial court clearly found that Father did *nothing* to financially or emotionally support the Child since at least March of 2012.

[23]     Adoptive Parents must demonstrate that Father "had the *ability* to provide for the support of the [C]hild and did not do so." *McElvain v. Hite*, 800 N.E.2d 947, 950 (Ind. Ct. App. 2003) (emphasis added). Proof of income, standing alone, is insufficient to establish an ability to provide support. *See In re Adoption of M.A.S.*, 815 N.E.2d 216, 221 (Ind. Ct. App. 2004). Instead, "it is necessary to consider the totality of the circumstances." *Id.* In addition to income, factors to consider include "whether that income is steady or sporadic and what the non-custodial parent's necessary and reasonable expenses were during the period in question." *In re Adoption of M.S.*, 10 N.E.3d 1272, 1280 (Ind. Ct. App. 2014).

[24]     Here, the trial court found that, since he was a child, Father has received Social Security-disability income based on his diagnosis of attention deficit hyperactivity disorder, for which he currently receives $710 per month. Father's benefits were suspended for the duration of his incarceration in the DOC, but he continued to receive payments while he was held in the Vanderburgh County Jail. Relying on his disability income, Father has been unemployed for the majority of his adult life even though he is "allowed to work . . . [fifteen] to [twenty] hours a week" and still maintain eligibility for his disability benefits. (Tr. p. 14). In the summer of 2013, Father began a part-time, seasonal job earning $10.00 per hour, but he stated that he rarely worked more than ten hours per week. The trial court found that Father never offered any portion of his disability benefits or wages to Adoptive Parents for the Child's support and further found that all of Father's "earnings were not required to sustain" the residence he shares with his wife. (Appellant's App. p.

50). Moreover, there is no evidence that Father sought any other employment in order to supplement his income so as to assist with the many special needs of his Child, yet he testified that he was able to pay $2,000 in cash for bail in October of 2012. From the evidence, it is apparent that Father's "priority was not the support of [the Child]." (Appellant's App. p. 51).

[25] According to Father, "[t]here was no evidence presented to the trial court that the parties ever[] had any other arrangement pertaining to . . . support." (Appellant's Br. p. 16). Additionally, Father asserts that Adoptive Parents never requested any support, and they were receiving the disability benefits paid on behalf of the Child. We find little merit in these contentions. First, the fact that Adoptive Parents did not demand child support does not negate Father's legal duty to provide for his Child. In fact, our supreme court has declared that private agreements between parties are insufficient to nullify a child support obligation. *See In re Adoption of T.L.*, 4 N.E.3d at 663. Second, the trial court found that Father never applied for the Child to receive Social Security benefits as the child of a parent with a disability; rather, Adoptive Parents took the initiative to apply for financial assistance on behalf of the Child.

[26] The relevant time period for determining whether a non-custodial parent has supported his or her child is "*any year* in which the parent had an obligation and the ability to provide support, but failed to do so." *In re Adoption of J.L.J.*, 4 N.E.3d 1189, 1194 (Ind. Ct. App. 2014) (emphasis added), *trans. denied*. Pursuant to Indiana Code section 31-19-15-1(b), Father's obligation to support the Child "continue[d] until the entry of the adoption decree" on August 28,

2014. Because Father did not pay any child support between March of 2012 and August 28, 2014, we find no error in the trial court's determination that Father voluntarily failed to provide for the care and support of the Child for at least one year.

## CONCLUSION

[27] Based on the foregoing, we conclude that the trial court erroneously found that Father failed to significantly communicate with the Child for at least one year; however, the evidence and findings clearly support the trial court's determination that Father voluntarily failed to provide for the care and support of the Child for at least one year. Therefore, we affirm the trial court's conclusion that Father's consent to the Child's adoption was not required.

[28] Affirmed.

[29] Barnes, J. concurs

[30] Bailey, J. concurs in result without separate opinion