

FILED

CLERK
of the supreme court,
court of appeals and
tax court

## FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DERICK W. STEELE**
Deputy Public Defender
Kokomo, Indiana

ATTORNEY FOR APPELLEE:

**RAKUYA K. TRICE**
UAW Chrysler LLC Legal Services Plan
Kokomo, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE ADOPTION OF S.W., | ) | |
| | ) | |
| THOMAS WEST, | ) | |
| | ) | |
|     Appellant-Respondent, | ) | |
| | ) | |
|         vs. | ) | No. 34A04-1202-AD-77 |
| | ) | |
| RONNIE D. SEDBERRY and, | ) | |
| SONDRA A. SEDBERRY, | ) | |
| | ) | |
|     Appellees-Petitioners. | ) | |

APPEAL FROM THE HOWARD CIRCUIT COURT
The Honorable Lynn Murray, Judge
Cause No. 34C01-1104-AD-21

**July 25, 2012**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Thomas West ("West") appeals the order of the Howard Circuit Court granting the petition filed by Ronnie D. Sedberry and Sondra A. Sedberry (collectively "the Sedberrys") seeking to adopt West's biological daughter, S.W. On appeal, West claims that the trial court erred in concluding that West's consent to the adoption was not required because of his failure to significantly communicate with S.W.

We affirm.

**Facts and Procedural History**

S.W. was born in March 2000 to Paige Ann (Pettit) Kelly ("Mother"), and West later executed an affidavit establishing his paternity of S.W. Approximately four months after S.W.'s birth, Mother was incarcerated and remained incarcerated until August 2005. Upon Mother's incarceration, S.W. was entrusted to the care of Mother's parents, the Sedberrys. The Sedberrys were appointed as S.W.'s legal guardians in May 2001.

A support order obliging West to support S.W. was never entered, and West never provided the Sedberrys with any financial support to assist them in raising his daughter. Like Mother, West used illicit drugs and alcohol on a regular basis and was employed sporadically as a dishwasher. West used cocaine, oxycodone, and marijuana.

The Sedberrys attempted to maintain a relationship between West and S.W. They arranged for West to visit S.W. at their home and on a few occasions even drove S.W. to West's parents' home to visit with West. Between 2000 and 2002, the Sedberrys arranged for West to pick up S.W. for visitation, but West failed to show up, explaining that he was "too high" to visit with his daughter. Tr. p. 12. West's failure to show up for

2

these scheduled visits upset S.W. West never contacted the Sedberrys after this to arrange further visitation.

Mother was released from incarceration in 2005, and sometime thereafter, the Sedberrys' son died. During the aftermath of her son's death, Mrs. Sedberry let S.W. stay with Mother for approximately three months. During this time, West stayed with Mother occasionally as well. Then, in 2006, West was incarcerated as a result of his conviction for Class B felony burglary of the home of his own grandfather. West was sentenced in 2007 to twenty years executed. His projected release date is September 14, 2016,[1] at which time S.W. will be sixteen years old.

In 2010, the Sedberrys again attempted to foster a relationship between S.W. and West. They purchased Thanksgiving, Christmas, and Father's Day cards, had S.W. sign them, and sent them to West in prison. They even contacted West's mother in an effort to have West's family visit S.W. The Sedberrys also gave West's mother S.W.'s identification documents so that S.W. could visit West in prison. After this, however, West's family never contacted the Sedberrys to arrange to take S.W. to see West in prison. In 2010 and 2011, West's parents did visit with S.W. a few times. However, after one of these visits, S.W. informed the Sedberrys that she did not feel comfortable during these visits, referring specifically to vulgar, inappropriate comments made by W.W., who is West's son and S.W.'s half-brother. West's mother stated that she was too physically ill to visit S.W. frequently.

---

[1] West testified that he could possibly be released in 2015 if completed the CLIFF (Clean Living is Freedom Forever) program.

3

On February 16, 2011, Mother died. On April 7, 2011, the Sedberrys filed a petition seeking to adopt S.W. In their petition, the Sedberrys alleged that West's consent was not required because he had unjustifiably failed to communicate with S.W. for a period of one year even though he was able to do so. They also alleged that West had failed to provide support for S.W., was unfit to parent, and had abandoned S.W. prior to his incarceration. On April 19, 2011, West filed a motion to contest the adoption. The trial court held an evidentiary hearing on the matter on January 12, 2012. On January 17, 2012, the trial court issued findings of fact and conclusions of law granting the Sedberrys petition to adopt S.W. These findings and conclusions read in relevant part:

1. Thomas West and the late Paige Pettit are the natural parents of [S.W.], . . . now eleven (11) years of age.

2. [S.W.] was born out of wedlock. [West]'s paternity of [S.W.] was established by means of the parents' execution of a paternity affidavit per Ind. Code section 16-37-2-2.1.

3. When [S.W.] was four (4) months old in July 2000, her mother Paige was incarcerated, and her father [West] was unable to assume care for the child. Maternal grandparents Ronnie and Sondra ("Sandy") Sedberry assumed care and custody of [S.W.] beginning in July 2000.

4. In May 2001, Ronnie and Sandy Sedberry were appointed guardians of [S.W.].

5. [Mother] remained incarcerated in the Indiana Department of Correction[] for five (5) years, until she was released in August 2005.

6. While [S.W.] was being cared for by her grandparents and guardians the Sedberrys, [West] visited with the child two (2) or three (3) times, the last time when [S.W.] was about eighteen (18) to twenty-four (24) months old.

7. There were times when [West] made arrangements to come visit but did not show up, later saying that he was "too high", and/or he was "in no condition to visit." After sometime in 2002, Thomas did not show up for any further visits, and he did not contact the Sedberrys to schedule any visits.

4

8. In May 2002, [West] was convicted of Robbery, a C felony and sentenced to four (4) years, two (2) years executed with one (1) year to be served on in-home detention, followed by two (2) years on supervised probation.

9. [Mother] was released from the Department of Correction[] in August 2005, and she with her teenage son [J.Y.] maintained a residence at the Village Green Trailer Park in Kokomo. From late September to early December 2005, [S.W.] resided with [Mother] and [J.Y.] at Village Green for about three (3) months when the Sedberrys were in Arizona after their son died. After December 2005, [S.W.] resumed living with her grandparents and guardians, while visiting with [Mother] a few days at a time.

10. From August 2005 to May 2006, [West] stayed occasionally with [Mother] at Village Green, then at her home on Tomahawk Drive in Kokomo. [West] saw [S.W.] from time to time when the child visited with her mother and when [West] was at [Mother]'s home.

11. During this time, [West] worked occasionally as a dishwasher at local Kokomo restaurants. Also, during this time, [West] was using illegal drugs including oxycontin, cocaine, and marijuana. In August 2005, he pled guilty to conversion, received a suspended sentence of one year, and was ordered to complete drug treatment.

12. In April 2006, [West] was arrested on charges of burglary and theft. He posted bond two (2) days later, but in May 2006, he was arrested on additional charges of theft and burglary, and he remained in jail thereafter. In June 2006, he was charged with an additional count of theft.

13. In October 2006, [West] pled guilty to Burglary, a Class B felony, and the other pending charges were dismissed. He admitted to having burglarized his grandfather's residence, taking items and pawning them for drug money.

14. In March 2007, [West] was sentenced to the Indiana Department of Correction[] for a period of twenty (20) years, all executed.

15. [West] has been continually incarcerated from May 2006 through the present. His projected release date is September 14, 2006. If [West] successfully completes the CLIFF program, he may be eligible for release sometime in 2015.

16. [West] last saw [S.W.] in late 2005 or early 2006, when the child was visiting her mother's residence in Kokomo.

17. Since incarcerated, [West] has sent [S.W.] letters and cards on occasion.

18. In 2010, Sandy Sedberry and/or [S.W.] sent [West] cards for father's day, thanksgiving and Christmas.

19. In 2010, Sandy Sedberry contacted Judy Bagby, [West]'s mother, and offered to permit Judy and her family including [West]'s teenage son [W.W.] to visit [S.W.]. Subsequently, [S.W.] visited with the Bagbys several times. On one occasion in early 2011, [S.W.] talked with [West] on the telephone from the Bagby residence.

20. [S.W.]'s last visit with the Bagbys took place in June 2011. After [S.W.] told Sandy [Sedberry] she did not enjoy the visits, Sandy would no longer agree to future visits.

21. In 2010, Sandy gave to Judy Bagby copies of [S.W.]'s identification card and birth certificate so Judy could take [S.W.] to see Thomas [in prison]. Judy did not take [S.W.] to see [West] because of Judy's health problems.

22. On February 16, 2011, [S.W.]'s mother Paige died.

23. Following their daughter's death, Ronnie and Sandy Sedberry decided to pursue an adoption of [S.W.]. They filed the petition for adoption initiating this action on April 7, 2011.

24. In September 2011, the Sedberrys with [S.W.] relocated to Arizona, while maintaining a residence in Kokomo, Indiana.

25. [S.W.] is now eleven (11) years of age, and attending 5th grade.

26. Mr. and Mrs. Sedberry have been [S.W.]'s caregivers for more than ten (10) years, since the child was four (4) months old. They have been her legal guardians since the child was a year old.

27. The Sedberrys are seventy-one (71) and sixty-nine (69) years old respectively, and in good health. They have been married for forty-four (44) years. Neither has been convicted of a felony or misdemeanor offense relating to the health and safety of a child. They have sufficient ability and income to continue to raise [S.W.].

28. The Sedberrys have provided financial and emotional support, and have been the primary parental figures for [S.W.] since her birth.

29. After the Sedberrys filed their petition to adopt [S.W.], Thomas West filed a motion to contest the adoption on April 19, 2011. The court appointed the Howard County public defender to represent Thomas. Subsequently, . . . a deputy public defender for Howard County entered his appearance and represented Thomas at the adoption hearing.

30. The court granted the Sedberrys' motion to waive a home[-]study report since they are the child's grandparents and have been her guardians

since 2001. They filed confirmation that a criminal background report had been done showing no disqualifying criminal convictions.

31. A hearing on the petition for adoption was held on January 12, 2012. Thomas West was present in person, having been transported from the Department of Correction[], and by his court appointed counsel. After evidence was concluded, the court took the petition under advisement.

32. In their petition for adoption, the Sedberrys allege that the consent by Thomas West is not required. They claim that [West] abandoned the child, has not supported the child, and has made only token efforts to communicate with the child during her lifetime. The [Sedberrys] further claim that [West] is unfit to be a parent and the best interests of the child would be served if the court dispenses with [West]'s consent.

* * *

39. The court finds by clear, cogent and indubitable evidence that [West] has failed without justifiable cause to communicate significantly with his child [S.W.] for a period of at least one (1) year. During the period from [S.W.]'s birth in March 2000 to May 2006, [West's] contacts and attempts to have contact with [S.W.] were token and insignificant. The contacts in 2001 and 2002 consisted of a few visits [West] had at the Sedberry home, thereafter, he stopped appearing for visits and did not schedule any visits. He had no contact from 2002 until August 2005, after [S.W.]'s mother Paige was released from prison, and she had [S.W.] with her for periods of time. Since May 2006, [West] has been incarcerated, and his only contacts with [S.W.] have been a few cards and letters, and one telephone conversation.

40. The court finds and concludes that the petitioners have proved by clear and convincing evidence that there have been periods of more than a year when [West] was not incarcerated and he did not have any significant contact with [S.W.].

41. The court further finds and concludes that the petitioners have proved by clear and convincing evidence that [West] is unfit to be a parent to [S.W.], and the best interests of the child would be served if the court dispenses with [West's] consent.

42. Prior to his incarceration in May 2006, [West] has a substantial history of illegal drug use and committing crimes. Since May 2006, he has been incarcerated for committing burglary of his elderly grandfather's home in a drug related crime. His current earliest release date from prison is September 16, 2016, when [S.W.] would be sixteen (16) years old.

7

43. It is well settled that individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. Castro v. State Office of Family and Children, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), trans. denied.

44. After [West's] release from prison, there is no guarantee that he will be able to provide for [S.W.] or that he will ever obtain custody of her. [S.W.]'s needs for stability and permanence are too important to force her to wait until a determination can be made that [West] will be able to be a fit parent for her.

45. There is ample evidence to conclude that [S.W.]'s best interests are served by granting the Sedberrys' petition to adopt her. Since [S.W.] was four (4) months old, the Sedberrys have been her primary care-givers and source of financial support. As grandparents and guardians, they have provided [S.W.] with stability and the nurturing care she requires. The court finds and concludes by clear and convincing evidence that it is in [S.W.]'s best interest that the Petition for Adoption be granted over the objection of [West].

46. Based on the foregoing findings and conclusions, the court finds and concludes that Thomas West's consent to adoption is not required for the court to grant the Petition for Adoption, and his motion to contest the adoption should be and is denied.

47. The court further finds that all other requirements having been met, that the court should and does hereby enter a Decree of Adoption contemporaneously with these findings and this Order.

Appellant's App. pp. 12-20.[2] West now appeals.

**Standard of Review**

Upon review a trial court's ruling in an adoption case, the appellant bears the burden of overcoming the presumption that the trial court's decision is correct. In re Adoption of A.S., 912 N.E.2d 840, 851 (Ind. Ct. App. 2009) (citing In re Adoption of

---

[2] In the portion of the trial court's findings omitted from the quote above, the court found that West's failure to support S.W. could not be a basis for not requiring his consent to the adoption because there was no court order requiring West to pay child support. However, it is well settled that parents have a common-law duty to support their children even in the absence of a court order. In re Adoption of M.B., 944 N.E.2d 73, 77 (Ind. Ct. App. 2011) (citing Boone v. Boone, 924 N.E.2d 649, 652 (Ind. Ct. App. 2010)). The lack of a court order did not relieve West of his legal obligation to support his child. See id.

8

H.N.P.G., 878 N.E.2d 900, 903 (Ind. Ct. App. 2008)), trans. denied. We will neither reweigh the evidence or judge the credibility of witnesses; instead, we will consider the evidence most favorable to the trial court's decision, and the reasonable inferences to be drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. Id. We will not disturb the trial court's ruling unless the evidence leads to only one conclusion and the probate court reached an opposite conclusion. Id.

Where the trial court enters findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), we employ our familiar two-tiered standard of review: we must determine whether the evidence supports the findings and whether the findings support the judgment. Id. We will not set aside the findings or the judgment unless they are clearly erroneous. Id. Findings of fact are clearly erroneous if the record is devoid of any evidence or reasonable inferences to support them, while a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. Id.

**Discussion and Decision**

West claims that the trial court erred in granting the petition to adopt despite his objection and lack of consent to the adoption. Parental consent is generally required to adopt a child in Indiana. See Ind. Code § 31-19-9-1. However, consent to adoption is not required from any of the following:

> (1) A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

9

(2)   A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

(A) fails without justifiable cause to communicate significantly with the child when able to do so; or

(B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

\* \* \*

(11) A parent if:

(A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

(B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Ind. Code § 31-19-9-8(a).   Subsection (b) of this statute further provides that "[i]f a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent."

The provisions of this section are disjunctive, and any one provides independent grounds for dispensing with parental consent.  In re Adoption of D.C., 928 N.E.2d 602, 606 (Ind. Ct. App. 2010) (citing In re Adoption of T.W., 859 N.E.2d 1215, 1218 (Ind. Ct. App. 2006)), trans. denied.

West claims that the Sedberrys had the burden to prove the elements of section 31-19-9-8(a)(2) by "clear, cogent, and indubitable evidence."  See, e.g., In re Adoption of Augustyniak, 505 N.E.2d 868, 870 (Ind. Ct. App. 1987) (holding that petitioner for adoption without parental consent bears the burden of proving the statutory criteria by "clear, cogent and indubitable evidence."); In re Bryant, 134 Ind. App. 480, 493, 189 N.E.2d 593, 600 (1963) (same).  However, in the case of In re Adoption of M.A.S., 815 N.E.2d 216, 219 (Ind. Ct. App. 2004), this court examined the applicable law and pointed

10

out that use of the "clear, cogent, and indubitable evidence" standard would create inconsistent burdens across the different statutory bases for adoption, given the 2003 amendment to the adoption statute. The court in M.A.S. held that the burden of proof for an adoption without consent, under any of the subsections in section 31-19-9-8, is that of "clear and convincing evidence." 815 N.E.2d at 220; see also In re Adoption of M.B., 944 N.E.2d 73, 76-77 (Ind. Ct. App. 2011); In re Adoption of N.W., 933 N.E.2d 909, 913 (Ind. Ct. App. 2010), opinion adopted, 941 N.E.2d 1042 (Ind. 2011); D.C., 928 N.E.2d at 606; In re Adoption of H.N.P.G., 878 N.E.2d 900, 906 (Ind. Ct. App. 2008); T.W., 859 N.E.2d at 1217 (all applying "clear and convincing evidence" standard).

West claims that the trial court's finding regarding his lack of communication with S.W. was erroneous. West notes that the trial court acknowledged that he had some contact with S.W., and claims that he attempted further contact with S.W. but was thwarted by the Sedberrys and their frequent trips to Arizona. However, the Sedberrys were not required to prove that West had *no* communication with S.W. They had to prove that he, for a period of one year, "fail[ed] without justifiable cause to communicate *significantly* with the child when able to do so." I.C. § 31-19-9-8(a)(2)(A) (emphasis added). Indeed, we have held that the purpose of this statutory provision is to "foster and maintain communication between non-custodial parents and their children, not to provide a means for parents to maintain just enough contact to thwart potential adoptive parents'

efforts to provide a settled environment to the child." In re Adoption of J.P., 713 N.E.2d 873, 876 (Ind. Ct. App. 1999).[3]

West's infrequent and sporadic communication with S.W. is well established in the record. There was evidence indicating that West had only a few visits with S.W. after her birth and failed to appear for several scheduled visits. West had no contact at all with the child from 2002 until Mother was released from prison in 2005. After his incarceration in 2006, West had little communication with S.W. despite the Sedberrys' willingness to let S.W. visit West in prison. Given this evidence, we cannot say that the trial court clearly erred in finding that West failed to communicate significantly with S.W. for over a period of one year even though he was able to do so. This was sufficient to establish that West's consent was not required. See J.P., 713 N.E.2d at 876 (concluding that biological mother's communication with daughter were not significant, and thus mother's consent to adoption by foster mother was not required, where mother lived with her husband and child's half-sibling in another state, traveled to Indiana at most once a month to visit with daughter for two to five hours and characterized these trips as "hardships," and daughter's reaction to these visits was not favorable).

West also claims that his mother had "significant and frequent" visits with S.W. To support his claim, he refers to the testimony of his mother. However, this is evidence which does not favor the trial court's judgment, and we may not consider such on appeal. A.S., 912 N.E.2d at 851. It has been held that visitation by paternal family members may

---

[3] We also note that a parent's conduct *after* the petition to adopt was filed is "wholly irrelevant to the determination of whether the parent failed to significantly communicate with the child for any one year period." In re Adoption of Subsea, 562 N.E.2d 745, 750 n.3 (Ind. Ct. App. 1990).

12

constitute indirect communication by a non-custodial father. See In re Adoption of Thomas, 431 N.E.2d 506, 515 (Ind. Ct. App. 1982). And there was evidence that West's mother had some visitation with S.W. But the Sedberrys stopped the visits with West's mother after S.W. stated that she was uncomfortable with the sexually suggestive talk by West's son, W.W. And even after the Sedberrys provided West's mother with copies of S.W.'s identification documents, she never followed through with the plan to take S.W. to visit West in prison. Considering only the facts favoring the trial court's decision, we cannot say that it clearly erred by failing to consider West's mother's visits with S.W. as significant communication by West.

West also claims that the Sedberrys failed to prove that he was able to communicate with S.W.,[4] and asserts that his lack of communication was "likely" due to the Sedberrys frequent and sometimes lengthy trips to Arizona. Not only is this speculative, but it again asks us to consider the evidence contrary to the trial court's judgment. It is true that there was evidence that the Sedberrys visited Arizona quite often, and even moved there for approximately three years in beginning in 2004. But there is no evidence that they hid S.W. from West or his family. In this "communication age,"

---

[4] To the extent that West claims that his imprisonment made him unable to communicate with his daughter, the trial court correctly noted that those who "pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." Castro v. State Office of Family & Children, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) (quoting In re A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992)). Moreover, we would not necessarily hold an incarcerated parent to the same standard as a non-incarcerated parent when it comes to determining whether that parent's communication with his or her child were significant. See Williams v. Townsend, 629 N.E.2d 252, 256 (Ind. Ct. App. 1994) (Rucker, J., dissenting) (citing Lewis v. Roberts, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986). The evidence here, however, demonstrates that West had no significant communication with S.W. for over one year well before his incarceration and that this lack of significant communication continued after his incarceration.

moving to another state does not make frequent communication with one's child unduly burdensome or impossible. Moreover, West had no communication with S.W. after he stopped visiting her in 2002 and did not see her again until after Mother was released from prison approximately three years later. Thus, from some time in 2002 until the Sedberrys moved to Arizona in 2004, S.W. lived with the Sedberrys in Kokomo, yet West made no effort to communicate or visit his daughter. In short, there was ample evidence that West had no significant communication with his daughter for a period of over one year, despite being able to do so.[5]

In essence, West's appellate argument is simply one that we consider evidence that does not favor the trial court's decision, reweigh the evidence, assess the credibility of the witnesses, and come to a conclusion other than that reached by the trial court. This, of course, is contrary to the applicable standard of review.

Affirmed.

ROBB, C.J., and BAILEY, J., concur.

---

[5] We further note that the trial court also found that West was unfit to be a parent and that S.W.'s best interests would be served if West's consent were dispensed. See I.C. § 31-19-9-8(a)(11). This is a separate grounds for not requiring West's consent to the adoption. See D.C., 928 N.E.2d at 606. However, West makes no argument that the trial court's findings and conclusions are clearly erroneous with regard to his fitness as a parent. Thus, even if the trial court's findings and conclusions with regard to West's failure to significantly communicate were clearly erroneous, we would not reverse the judgment of the trial court.