

FILED

Jul 07 2017, 6:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Ashley Dyer
Dyer Law, L.L.C.
Linton, Indiana

## I N   T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re Adoption of E.B.F., J.W., <br> *Appellant-Respondent,* <br><br> v. <br><br> D.F., <br> *Appellee-Petitioner.* | July 7, 2017 <br><br> Court of Appeals Case No. 28A05-1702-AD-257 <br><br> Appeal from the Greene Circuit Court <br><br> The Honorable Erik C. Allen, Judge <br><br> Trial Court Cause No. 28C01-1501-AD-1 |

**Mathias, Judge.**

[1] In this contested adoption case, we consider whether the trial court clearly erred in ruling that the adoptive child's genetic mother failed without justifiable cause to communicate significantly with the child for one year when she was able to do so. Concluding it did not err in coming to that conclusion, we affirm.

## Facts and Procedural Posture

[2]    E.B.F. ("Child") was born to J.W. ("Mother") and M.F. ("Father") in 2003 in Sullivan County, Indiana. Mother and Father were never married. In 2005, Father married D.F. ("Step-Mother"). Mother was Child's primary physical custodian for the first ten years of Child's life.

[3]    In 2013, Father brought a paternity action in Greene Circuit Court. On December 12, 2013, that action resulted in an agreed order modifying custody, whereby Mother and Father would continue to share legal custody, Father would assume primary physical custody, and Mother would pay $0.00 for Child's support. Mother was to be given parenting time "at such times and upon such conditions as the parties are able to mutually agree." Appellant's App. p. 10.

[4]    Mother saw Child on Christmas Day, December 25, 2013. The instant adoption petition was filed by Step-Mother almost exactly one year later, January 2, 2015. Between December 25, 2013, and January 2, 2015, Child lived with Father and Step-Mother in Linton, Greene County, Indiana, and had little contact with Mother. Mother's mother ("Grandmother") at first had some contact with Child, but that too eventually waned. For some part of this period, Mother struggled with dependence on opioids, methamphetamine, and marijuana; was unemployed; was in a physically abusive marriage; and moved frequently around Greene County, though never more than an hour away from Linton. Eventually, however, Mother divorced her abuser and was able to find stable housing, employment, and a measure of control over her drug

dependencies. She still wished to parent Child and opposed Step-Mother's adoption petition when it was filed.

On August 20, 2015, and October 2, 2015, the trial court held a consent hearing to determine whether Mother's consent to adoption was required by statute. On November 25, 2015, the trial court ruled that Mother's consent was not required. Mother appealed that ruling and then voluntarily dismissed her appeal on the authority of this court's decision in *Adoption of S.J.*, 967 N.E.2d 1063, 1066 (Ind. Ct. App. 2012) (dismissing appeal from similar ruling *sua sponte* because taken neither from final judgment nor from appealable interlocutory order). On November 3, 2016, and December 21, 2016, the trial court held a best-interest hearing to determine whether adoption by Step-Mother would be in Child's best interest. On January 13, 2017, the trial court ruled that adoption would be in Child's best interest and granted Step-Mother's petition.

Mother now appeals, again challenging the trial court's ruling that her consent to adoption was not required.

## Standard of Review

In the hearing at issue in this appeal, it was Step-Mother's burden to prove by clear and convincing evidence that Mother's consent to adoption was not required. *In re Adoption of S.W.*, 979 N.E.2d 633, 640 (Ind. Ct. App. 2012). Mother contends (and the trial court agreed) that Step-Mother's burden was proof by "clear, cogent, and indubitable evidence[,]" *In re Adoption of Augustyniak*, 505 N.E.2d 868, 870 (Ind. Ct. App. 1987), but this standard has

been abrogated. *S.W.*, 979 N.E.2d at 640; *In re Adoption of M.A.S.*, 815 N.E.2d 216, 219 (Ind. Ct. App. 2004) (interpreting 2003 statutory amendments).

[8]     We will not set aside the trial court's judgment in an adoption matter unless it is clearly erroneous. *In re Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014). A judgment is clearly erroneous if the evidence fails to support the court's findings, or if the findings fail to support the court's judgment. *Id.* We will not impose our own view of whether the evidence was clear and convincing. *M.A.S.*, 815 N.E.2d at 220. Rather, without weighing the evidence or assessing credibility of witnesses, and considering only the probative evidence and reasonable inferences therefrom in support of the judgment, we ask whether a reasonable trier of fact could have concluded that the judgment was supported by clear and convincing evidence. *Id.*

## Discussion and Decision

[9]     Generally, a noncustodial genetic parent's consent to adoption is required before an adoption petition may be granted. Ind. Code § 31-19-9-1(a)(2). However, the parent's consent is not required "if for the period of at least one . . . year the parent . . . fails without justifiable cause to communicate significantly with the child when able to do so[.]" *Id.* § 8(a)(2)(B). Thus, the petitioner in a contested adoption bears the burden of proving several elements under this subsection: a period of at least one year; absence of significant communication during that period; ability to communicate during that period; and absence of justifiable cause for failure to communicate during that period.

[10] The inquiry under the statute is highly fact- and context-specific. *Rust v. Lawson*, 714 N.E.2d 769, 772 (Ind. Ct. App. 1999), *trans. denied*. The inquiry is guided by the statute's purpose: to "foster and maintain" communication between a noncustodial parent and her child, "not to provide a means for parents to maintain just enough contact to thwart potential adoptive parents'[] efforts to provide a settled environment [for] the child." *In re Adoption of J.P.*, 713 N.E.2d 873, 876 (Ind. Ct. App. 1999).

[11] Whether communication was significant is not to be measured merely in units. *Id.* "One significant communication in a year would [be] sufficient" to bar nonconsensual adoption. *In re Adoption of Subzda*, 562 N.E.2d 745, 749 (Ind. Ct. App. 1990). However, even multiple, "fairly consistent" contacts may not be found significant in context. *J.P.*, 713 N.E.2d at 876 (not error to conclude mother's "short, not-quite-monthly visits" not significant); *see also S.W.*, 979 N.E.2d at 640 (not error to conclude "infrequent and sporadic communication" not significant).

[12] While the burden of proof in an adoption proceeding rests with the petitioner, the law holds a noncustodial parent responsible for maintaining a relationship with her child if she is to successfully resist an adoption petition. Circumstances that make significant communication difficult or inconvenient for a parent, such that the parent "ha[s] trouble" communicating with the child, *Subdza*, 562 N.E.2d at 749, do not justifiably excuse absence of communication or constitute an inability to communicate. *Id.; see also J.P.*, 713 N.E.2d at 876 ("hardship" of Tennessee-Indiana travel not justifiable cause); *In re Adoption of T.H.*, 677

N.E.2d 605, 607 (Ind. Ct. App. 1997) (father's "difficult time emotionally," child's often changing whereabouts, and general inconvenience involved in contacting child all insufficient to establish justifiable cause or inability to communicate). If means of communication are not immediately apparent, it is the noncustodial parent's duty "to investigate reasonable means" of communicating. *O.R.*, 16 N.E.3d at 974. These means may include indirect communication through a family member, *see Matter of Adoption of Thomas*, 431 N.E.2d 506, 515 (Ind. Ct. App. 1982); *In re Adoption of Anonymous*, 158 Ind. App. 238, 302 N.E.2d 507, 508-09 (1973), but a noncustodial parent does not per se communicate with her child merely because her parents do. *S.W.*, 979 N.E.2d at 641 (communication with child by father's mother not weighed in father's favor); *T.H.*, 677 N.E.2d at 607 (communications with child by father's parents not weighed in father's favor).

[13] Efforts of the custodial parent or prospective adoptive parent to thwart communication between the noncustodial parent and her child are relevant to determining ability to communicate and should be weighed in the noncustodial parent's favor. *E.W. v. J.W.*, 20 N.E.3d 889, 896-97 (Ind. Ct. App. 2014) (not error to weigh in mother's favor father's refusal to permit communication for one year, where prior to refusal mother visited weekly and continued to buy gifts for child while blocked from visitation), *trans. denied*; *In re Adoption of A.K.S.*, 713 N.E.2d 896, 899 (Ind. Ct. App. 1999) (error to conclude out-of-state father's consent not required where father sent letters to child and attempted to arrange visit with child, but mother returned letters unread and blocked visit).

However, the noncustodial parent must actually attempt significant communication before she is entitled to rely on the custodial parent's efforts to thwart her as a justifiable excuse; there is no futility exception to the statute. *See In re Adoption of T.W.*, 859 N.E.2d 1215, 1218 (Ind. Ct. App. 2006) ("[Father's] arguments that his overtures 'would have' been impeded is speculative."). The custodial or prospective adoptive parents are under no obligation to arrange or facilitate the noncustodial parent's communication, or to serve her convenience. *S.W.*, 979 N.E.2d at 641 (prospective adoptive parents' "frequent and sometimes lengthy trips to Arizona" not evidence of hiding child from noncustodial parent and did not make communication "unduly burdensome or impossible"); *T.H.*, 677 N.E.2d at 607 (mother's failure to keep father informed of developments in child's life does not establish justifiable cause or inability to communicate).

[14] In this case, the trial court found as follows:

> [Mother] has not sent [Child] any letters or birthday cards since December 2013, and . . . has not met with any of [Child's] teachers. . . .
>
> [Child] occasionally visited with [Grandmother] until around April 2014, and [Grandmother] says her calls and messages were not returned or answered [after that, the only change being] that she and [Mother] were again getting along. [Mother] claims she made some phone calls and sent text messages that were not returned or answered. Although [Step-Mother's] cell number changed at some point, [Father's] home number and [Step-Mother's place of employment, known to Mother,] remained unchanged. . . . [Step-Mother] denies telling [Mother] that she

cannot see [Child], and further denies ever avoiding [Mother] or keeping [Child] from seeing or communicating with [Mother].

[Mother] alleges that she has been denied contact with [Child], and her last contact with [Child] was a chance encounter at a gas station in May or June 2014, and [Father] provided [Mother] with his phone number at that time. [Mother] testified that she made several calls to [Father] that were not answered, that she made several attempts to see [Child] at the baseball fields, and that she would see [Step-Mother] at [her place of employment] and ask about [Child]. [Mother did not pursue] any Court proceedings to enforce her parenting time . . . .

The Court concludes the testimony is credible from [Step-Mother] that [Mother] has not been denied contact and that there has been minimal effort from [Mother] to contact [Child].

Appellant's App. p. 11. We next examine whether the court's findings support its judgment and whether the evidence supports the findings.

[15] The findings that, from December 2013 to January 2015, Mother was aware of ways to communicate with Child, Mother was not denied contact with Child by Step-Mother or Father, and that Mother put forward minimal effort to communicate with Child sufficiently support the judgment that Mother failed without justifiable cause to communicate significantly with Child for one year when she was able to do so. Grandmother did have apparently significant communication with Child for part of the one-year period, but Mother was not per se entitled to have that communication treated as her own, and Grandmother made clear that, when she asked to see Child during that period, she asked "on [her] own behalf[.]" Tr. Vol. I, p. 104.

[16]     Mother argues that this one-year period should not be permitted to overcome ten years of parenting Child as his sole physical custodian. She analogizes her case to *E.W.* There, on appeal from denial of a petition to adopt, we said that,

> even if[, contrary to the trial court's findings,] communication between [the noncustodial mother] and [her child] did appear insignificant between May 2010 and May 2011, [during which time mother had weekly three-hour visits,] . . . [i]t is undisputed that [the mother's] communication with [her child] increased in the two years after May 2011 [before the adoption petition was filed in September 2013]. *It would defy logic to allow a long-past, one-year period of poor communication to overcome a lengthy period of significant communication that immediately precedes the adoption petition*.

20 N.E.3d at 896 (emphasis added). Mother's analogy is not well taken because the situation here is precisely the reverse: Mother's communication with Child has not improved but deteriorated over time, and the one-year period of poor communication immediately preceded the instant adoption petition. We have said that the purpose of the statute is "to foster and maintain" parent-child communication. *J.P.*, 713 N.E.2d at 876. It would be entirely contrary to this purpose, and would tend to nullify the statutory one-year time requirement, to excuse a parent from fostering and maintaining communication with her child simply because, *before* the one-year period, her communication was not poor.

[17]     Concluding that the findings sufficiently support the judgment, we proceed to examine whether the evidence supports the findings.

[18]     Mother does not seriously contest that her only contacts with Child over the period in question were few, fleeting, and sometimes even unintended, i.e., were not significant. *See, e.g.,* Tr. Vol. I, p. 23 (Mother "ran into" Child, Father, and Step-Mother while shopping). Even her *proposed* communications with Child were not significant. *See, e.g., id.* p. 18 (when seeing Child with Father and Step-Mother in public, Mother approached "just to say hi, let [Child] know that I am getting back on my feet and everything is going to go back to normal"). Outside of chance public run-ins, Mother's only attempted contacts were phone calls that for various alleged reasons were not connected. *See, e.g., id.* p. 21 (after receiving phone number from Father in May, phone was "disconnected . . . in October and November"). Mother never attempted to write, participate in Child's school life, seek court enforcement of her parenting time, or investigate other reasonable means of communication.

[19]     Mother argues that she did in fact have one significant communication with Child when she expressed a desire to continue parenting Child after she encountered Child, Father, and Step-Mother at the local baseball fields. Appellant's Br. at 13. A witness for Step-Mother recalled the incident as follows:

> I do remember [Mother] saying, he is my son, I can do what I want[,] he needs to come with me right now[,] and . . . [Child] was standing behind [Father] and like holding on to the left side of his arm and [Mother] was trying to reach around [Father] to grab ahold of [Child] and [Child] was like no I don't want to go right now.

Tr. Vol. I, p. 71. We cannot allow Mother to convert what appears to be an attempted kidnapping into a significant communication with her son. At best, this incident manifested Mother's desire to have significant communication with Child — but that is not the same as having one.

[20] Mother's chief argument is that the evidence did not support the trial court's finding that Mother had no justifiable cause for her failure to communicate significantly with Child, particularly with respect to Step-Mother's and Father's alleged efforts to thwart Mother's communication. To the extent that Mother and Step-Mother gave conflicting testimony on this point, it was well within the province of the fact-finder to credit Step-Mother's testimony and to discredit Mother's; we will not revisit that assessment on appeal.

[21] However, Mother argues further that Step-Mother herself admitted in open court that she denied Mother the opportunity to communicate with Child and improperly introduced Child's wishes into the consent proceeding:

| [Mother:] | You told [Mother] that she can't see [Child] before? |
|---|---|
| [Step-Mother:] | No. |
| [Mother:] | You never told her that she can't see him? |
| [Step-Mother:] | No I said that he doesn't want to see her. |
| [Mother:] | Not even after the last hearing [on August 20, 2015,] when we were standing in this Courtroom you didn't say that you can't see [Child], he doesn't want to so I am not going to let him if he doesn't want to go back to |

|                    | that, I mean she was welcomed to call and start out that way and that never happened. |
| [Mother:]          | You just said he doesn't want to so I am not going to let him is that correct that is what you just said? |
| [Step-Mother:]     | If he would want to I would let him. |
| [Mother:]          | Okay you just said that if he doesn't want to then I am not going to let him? |
| [Step-Mother:]     | Yes. |
| [Mother:]          | After the last hearing I stated to your husband that if [Mother] wants to see the child they have to let her actually see the child and he said here in this Courtroom I refuse to let her see the child is that not correct? |
| [Step-Mother:]     | Yes. |

Tr. Vol. I, pp. 91-92.

[22] The ambiguities created by this jumbled back-and-forth in the transcript notwithstanding, nothing about this exchange undermines the trial court's findings. First, the exchange appears to refer to statements made while the adoption petition was pending, not during the one-year period at issue for statutory purposes. Second, it is not enough to show that Step-Mother *would have* rejected Mother's attempts at significant communication had Mother made them. Mother must have actually attempted significant communication and then been actually thwarted by Step-Mother or Father in order to establish

justifiable cause — but the trial court found that Mother did not make more than "minimal effort[s]" to communicate significantly with Child. Appellant's App. p. 11. Finally, to the extent that Step-Mother's statements in the above passage conflicted with her other testimony, it was still well within the fact-finder's province to credit the other testimony and to discredit the muddled testimony elicited above.

[23] It is extremely important to remember that burdens of proof in child-related hearings have been established through the years in order to determine and protect the best interests of the *child*, not the child's parents. We do not deny the difficulties Mother faced and overcame in 2014 in freeing herself from an abusive marriage and from her drug dependencies. We also acknowledge that it may seem unfair to Mother that, as a result of taking a year to "get[] back on [her] feet," Tr. Vol. I, p. 18, she has now lost the opportunity to continue parenting her son. However, our law puts the burden on Mother to continue to foster and maintain her relationship with Child, no matter the inconvenience to her in doing so, and does not permit her simply to take a one-year hiatus from parenting without consequence, no matter that she used that year to improve her circumstances. *See J.P.*, 713 N.E.2d at 876.

## Conclusion

[24] Sufficient evidence supported the trial court's findings, and those findings supported the trial court's conclusion that Mother failed without justifiable cause to communicate significantly with Child when she had the ability to do so. The judgment of the trial court is therefore affirmed.

Affirmed.

Kirsch, J., and Altice, J., concur.