## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 07 2018, 9:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen M. Heard
Evansville, Indiana

ATTORNEY FOR APPELLEE

John Andrew Goodridge
Evansville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Adoption of M.R.R., a child | November 7, 2018 |
| M.R., | Court of Appeals Case No. 18A-AD-923 |
| *Appellant-Respondent,* | Appeal from the Vanderburgh Superior Court-Juvenile Division |
| v. | The Honorable Brett J. Niemeier, Judge |
| N.G., | Trial Court Cause No. 82D04-1703-AD-29 |
| *Appellee-Petitioner.* | |

**Altice, Judge.**

[1] M.R. (Father) appeals the trial court's order granting the petition filed by N.G. (Stepfather) to adopt Father's biological child, M.R.R. Father claims that the trial court erred in concluding that his consent to the adoption was not required.

[2] We affirm.

## Facts & Procedural History

[3] Father and L.G. (Mother) are the biological parents of M.R.R., born in March 2009. At that time, Father and Mother were living together, and they married sometime in 2010. Father "got caught up in drugs and it turned him into a different person." *Transcript Vol. II* at 31. By May 2011, their marriage was dissolved. For about a year, Father exercised parenting time every other weekend. During that time, Father was living in Evansville with his mother (Grandmother), who was present for Father's visitations with M.R.R. In 2012, Father moved to Linton, Indiana, and while he still saw M.R.R. for visitations, it was less regularly. Mother explained, "[I]f he stopped asking to see [M.R.R.] that's when I knew that he typically wasn't clean. It was off and on a lot." *Id.* at 32. In January 2014, Mother married Stepfather. In May 2016, Mother filed a petition to modify custody and parenting time. Father initially objected but later signed an agreement in or around August 2016 awarding Mother sole custody and requiring that his parenting time be supervised by the paternal grandfather (Grandfather).

[4] On March 13, 2017, Stepfather filed a Petition for Adoption of M.R.R., alleging that Father "has had no meaningful contact with the child within the 12 months preceding the filing of this adoption petition and has not provided any support in the 5 years preceding the filing of this adoption petition." *Appellant's App. Vol. II* at 10. On the same date, Mother filed her consent to the adoption.

Notice was sent to Father, and he filed a pro se objection to the petition. A few days later, the county's Legal Aid Society entered an appearance on behalf of Father, and that same day, Father, by counsel, filed a more formal objection, stating that he was contesting the adoption and asserting adoption was not in M.R.R.'s best interests.[1]

On January 24, 2018, the trial court held an evidentiary hearing on Father's objection and the issue of his consent. Mother testified that after Father moved to Linton in 2012, he "went to rehab a few times" but he could not "stay clean" and eventually he returned to living with Grandmother in Evansville. *Transcript Vol. II* at 32. Mother testified that in 2015, Father became gravely ill with MRSA[2] that "was somehow connected with him having a drug problem" and, in Mother's view, Father was at "rock bottom, but he didn't get clean after hitting rock bottom." *Id*. at 34. Believing that "it was no longer safe for [M.R.R.] to be around him," Mother sought full custody and supervised visitation in May 2016. *Id*. Father was arrested on felony drug charges in or around this time, and in late summer or early fall of 2016, he agreed to the requested change in custody and supervised parenting time. Grandfather

---

[1] Father's counsel through the Legal Aid Society later withdrew and, in October 2017, the trial court appointed the Vanderburgh County Public Defender's Office to represent Father.

[2] MRSA is Methicillin-resistant Staphylococcus aureus infection and is caused by a type of staph bacteria that has become resistant to many of the antibiotics used to treat ordinary staph infections.

agreed to supervise the visitation, but Grandmother declined, explaining that she was not comfortable with supervising due to Father's drug usage issues.

[6] Mother testified that Father's last meaningful contact with M.R.R. was in February or March 2016. She described that, up until then, Father had been exercising parenting time "a day at a time here and there" but that stopped in February or March 2016, when she believed "he was starting to use heavily again." *Id*. at 35. From May 2016 until July 2017, Mother testified that Father had seen M.R.R. twice for some "hours" each time, and she did not consider it as meaningful contact. *Id*. at 38. Father gave M.R.R. a card for her eighth birthday, in March 2017, putting it in their mailbox. Mother stated that, since the dissolution, Father had attended "zero" doctor appointments and dentist appointments and had never contacted Mother about school or medical issues. *Id.* at 42. Mother characterized Father as having been "non-existent for the past three years or so[.]" *Id*. at 39. Stepfather testified that, to his knowledge, Father had had no meaningful contact with M.R.R. in the two years preceding the January 2018 hearing.

[7] When asked about when Father had last paid child support, Mother replied, "Early 2015, late 2014. I don't really keep track of the dates. I just never really counted on it." *Id*. at 42. She said that he paid consistently "for the first year or so" after the 2011 dissolution, then inconsistently up until sometime in 2015, and then he quit paying. *Id*. at 43. Mother explained her motivation in seeking adoption was to keep M.R.R. safe, physically and emotionally, and to ensure that if anything were to happen to Mother, that M.R.R. would remain in the

household with her siblings and Stepfather, who was reliable and had been raising her. Mother stated that, if the adoption were granted, she "absolutely" wanted to continue to foster the relationship between M.R.R. and Father's parents (Grandparents). *Id*. at 44. Mother had faith in Grandparents that they would not let M.R.R. be around Father if he was under the influence of drugs.

[8] Grandmother testified that she saw M.R.R. regularly, about once a month, and that M.R.R. would stay overnight with her. Grandmother arranged those visits through Mother and Stepfather. Grandmother stated that while Stepfather was a nice man, a responsible person, and she did not have any concerns about him in terms of being a parental figure for M.R.R., she was opposed to adoption. Grandmother explained that she wanted M.R.R. to have a relationship with Father, stating although "he hasn't always done everything he should" and has had "a drug issue," "he's [M.M.R.'s] Dad and she should see him." *Id.* at 14. Grandmother added, "If he's clean it doesn't [need to be supervised]. But I don't know if he's clean." *Id*. at 25. In response to questioning about the drug issue, Grandmother recalled that Father had struggled with addiction to opioids "on and off" for about eight years, since the time that he had been living with Mother, and he had been in jail twice. *Id*. at 18.

[9] When asked what communication Father had had with M.R.R. in the last year, Grandmother replied, "I don't think he's had very much." *Id*. at 27. With regard to whether Father had given presents to M.R.R., Grandmother said, "He's told me that he has 'em. He doesn't kn[o]w when he can give 'em to her. I don't know. I haven't seen 'em." *Id.* Grandmother indicated that on

approximately three or four occasions in the last year, Father had asked her if he could see M.R.R. while M.R.R. was staying with Grandmother, but Grandmother did not allow him to do so because, when Grandmother asked Mother if this was acceptable, Mother had said no to the request, and Grandmother "respected" Mother's decision. *Id.* at 29.

[10] Father also testified at the consent hearing. He acknowledged that he had been an opiate addict for about ten years and a heroin addict for the last few years. He had been "in rehab" four times, in jail a few times, and he had been charged with two felony drug offenses. *Id.* at 50. Father testified that he had a daily drug habit, but as of the date of the hearing, he had been clean for three days, noting that he was in an outpatient program, but had been "struggling lately" and hoped to be admitted to an inpatient program. *Id.* at 51. He also acknowledged that he paid child support "here and there" but not consistently and believed he last paid in 2015. *Id.* Father said that he was hospitalized in September 2015 for MRSA, agreeing that, up until he was hospitalized, he had been using drugs and needles, which was "probably" how he contracted the MRSA infection. *Id.* at 52. He stated that, when he was working, he paid child support, but he did not work for most of 2016. He testified that to satisfy his drug habit he sometimes, but not always, would purchase "$20.00 bumps" of heroin once or twice a day. *Id.* at 55. Father conceded that during periods of being unemployed he bought drugs but did not pay child support.

[11] Father testified that from March 2016 to March 2017, he tried to see M.R.R. a few times, with Grandfather as supervisor, but because Grandfather lived an

hour away, Father conceded, "[S]o no, I didn't attempt a whole lot." *Id*. at 59. Father was asked, "Was it hard because of the distance or was it hard because you were high?" and he replied, "I can still drive if I'm high. I mean, if I was high I still wanna see my daughter." *Id*. at 59. When asked to acknowledge that he had not "been much of a dad to [his] daughter," Father agreed that "[a]bout the last year and a half, no, I haven't been much of one." *Id*. at 59. Father explained that, although he had not "been the best Dad" and struggled with addiction, he objected to the adoption because he wanted to be a part of his daughter's life and see her "every other weekend or whenever they decide" and under whatever restrictions would be imposed. *Id*. at 65, 72.

[12] The trial court took the matter under advisement. On February 12, 2018, the trial court ruled that Father's consent was not required. Specifically, it determined:

> The Court having the matter of father's consent under advisement now rules that the father's consent is not required for the adoption to be granted. The father has had no meaningful contact with the child at least one year prior to the filing of the adoption nor has he supported the child for that same period of time. Further the court finds the father to be unfit. Father for a prolonged period of time has used various substances illegally and continues to illegally use substances that impair his ability to parent. After hearing the testimony of the father the court believes that the father has no intention of remedying his substance abuse problem, in that he doesn't view it as a significant hindrance in his ability to parent, therefore in this court's opinion rendering him unfit.

*Appellant's Appendix Vol. II* at 6.

On March 15, 2018, the trial court held a final adoption hearing, following which the trial court issued a Decree of Adoption, granting Stepfather's petition. The trial court found that the allegations of Stepfather's petition were true and that adoption was in M.R.R.'s best interests.[3] Father now appeals the trial court's determination that Father's consent was not required for the adoption.

## Discussion & Decision

As our Supreme Court has recognized, "In family law matters, we generally give considerable deference to the trial court's decision because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, 'get a feel for the family dynamics,' and 'get a sense of the parents and their relationship with their children.'" *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018) (citing *MacLafferty v. MacLafferty*, 829 N.E.2d 938, 940 (Ind. 2005)). Accordingly, when reviewing an adoption case, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption. *Id.*; *In re Adoption of S.W.*, 979 N.E.2d 633, 639 (Ind. Ct. App. 2012). We will neither reweigh the evidence nor judge the credibility of witnesses; instead, we will consider the evidence most favorable to the trial court's decision, and the reasonable inferences to be drawn therefrom, to determine whether sufficient evidence exists to sustain the decision. *In re S.W.*,

---

[3] The trial court also changed M.R.R.'s surname to that of Mother and Stepfather.

979 N.E.2d at 639. We will not disturb the trial court's ruling unless the evidence leads to only one conclusion and the trial court reached an opposite conclusion. *Id*.

[15] Generally, a trial court may grant a petition for adoption only if both the mother and father of the child consent. Ind. Code § 31-19-9-1. However, Ind. Code § 31-19-9-8(a) provides that consent to an adoption is not required from:

> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
>>
>> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
>
> ****
>
> (11) A parent if:
>
>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
>>
>> (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

Ind. Code § 31-19-9-8(a)(2), (11). Stepfather, as the petitioner, had the burden of proving by clear and convincing evidence that consent was not required. *In re Adoption of M.L.*, 973 N.E.2d 1216, 1222 (Ind. Ct. App. 2012). The provisions of Ind. Code § 31-19-9-8 are written in the disjunctive; therefore, they each provide independent grounds for dispensing with parental consent. *Id.*

[16] Here, the trial court determined that Father's consent was not required because (1) Father had failed to communicate significantly with M.R.R. for a year preceding Stepfather's filing of the petition in March 2017, (2) he had not paid child support for that period of time, and (3) he was unfit to parent M.R.R. While any one of those three grounds would independently support the decision that Father's consent was not required, we find that the record supports all three and we address each.

[17] First, with regard to communication, our Supreme Court has recognized, "A determination on the significance of the communication is not one that can be mathematically calculated to precision." *E.B.F.*, 93 N.E.3d at 763. The Court explained,

> [S]ignificance of the communication cannot be measured in terms of units per visit. Even multiple and relatively consistent contacts may not be found significant in context. But a single significant communication within one year is sufficient to preserve a non-custodial parent's right to consent to the adoption.

*Id.* (citations omitted).

[18]     Here, Mother testified that, by early 2016, the frequency of Father's visitations with M.R.R. were "already starting to dwindle" and then stopped occurring in February or March of 2016 when he resumed "heavily" using drugs. *Transcript Vol. II* at 35. Mother testified that Father had had no meaningful communication with M.R.R. since February or March 2016, and Stepfather testified likewise. There was evidence presented that Father had seen M.R.R. on two occasions between May 2016 and July 2017, for some hours each time, but Mother testified that she did not consider those occasions as meaningful contact. Father's suggestion that such contact was meaningful is a request for us to reweigh the evidence and witness testimony, which we cannot do on appeal. *In re S.W.*, 979 N.E.2d at 639. Furthermore, Father did not present any evidence of specific visits on specific dates or elaborate in what way those visitations were meaningful.[4] Father also argues that he attempted on a few other unspecified occasions in 2016 to see M.R.R. – by asking Grandmother to see M.R.R. while she was visiting with Grandmother or by trying to arrange a supervised visitation through Grandfather – and that either Grandmother did not allow it because Mother had not approved or because Grandfather was too busy. To the extent that Father is suggesting that his attempts to see M.R.R.

---

[4] Father asserts that he had meaningful visits with M.R.R. in 2017 at a family gathering for his sister and her new baby, during a summer fireworks celebration that M.R.R. was attending with Grandfather, and when he attended some of M.R.R.'s sporting events. However, these events occurred *after* the filing of the petition to adopt and are not relevant to the determination of whether his consent was not required. *See In re Adoption of S.W.*, 979 N.E.2d 633, 640 n.3 (Ind. Ct. App. 2012) (parent's conduct after filing of adoption petition is "'wholly irrelevant to the determination of whether parent failed to significantly communicate with child for any one year period,'" quoting *In re Adoption of Subzda* 562 N.E.2d 745, 750 n.3 (Ind. Ct. App. 1990)).

were thwarted by Mother or in some way justified his lack of communication with M.R.R., we reject his claim. Father has failed to show that the trial court's determination that he failed to communicate significantly with M.R.R. in the relevant time frame was erroneous.

[19] Second, with regard to the matter of supporting the child, Mother testified Father had failed to pay child support since 2015, and Father agreed this was accurate. Evidence of child support payments made through the Clerk's office was admitted into evidence and showed that Father made some payments, not weekly however, during the months of January 2015 through June 2015, and he made none in 2016.[5] Father testified that he did not provide child support in any other form or method besides the payments made through the Clerk's office. The record thus supports the trial court's determination that Father failed to provide care and support for M.R.R. for a year preceding the petition.

[20] Third, with regard to Father's fitness to parent M.R.R., this court has observed that, while I.C. § 31-19-9-8 does not define "unfit," termination cases provide useful guidance, where we considered factors such as a parent's substance abuse, mental health, willingness to follow recommended treatment, lack of insight, and instability in housing and employment. *In re M.L.*, 973 N.E.2d at 1223. Here, evidence was presented that Father had struggled with significant drug addiction for ten years. He went to rehabilitation three or four times, but

---

[5] Father resumed making some payments in May, June, July, and August 2017, which was after the petition was filed in March 2017.

was not successful in remaining drug-free, as he resumed using opioids and heroin, often daily. Father had managed to stay clean for three days preceding the hearing, but admitted that he was struggling and hoped to return to inpatient treatment. He conceded that he was unemployed for most of 2016 and was not working much in 2017. He acknowledged that, at times, he paid for drugs and not child support. In his testimony, Father urged that he still wanted to and could see his daughter even if he was high, so long as she did not see or know that he was using drugs. The trial court found that Father's failure to recognize the drug use "as a significant hindrance in his ability to parent" rendered him unfit to parent. *Appellant's Appendix Vol. II* at 6. The record supports the trial court's determination that Father was not fit to parent M.R.R.

[21] No one, including Mother, disputes that Father loves his daughter. Unfortunately, however, "the destructive tentacles of the substance abuse epidemic" have a grip on Father. *E.B.F.*, 93 N.E.3d at 760. As stated, we will not disturb the trial court's ruling unless the evidence leads to only one conclusion and the trial court reached an opposite conclusion. *In re S.W.*, 979 N.E.2d at 639. The record in this case supported the trial court's decision that Father's consent was not required.[6]

[22] Judgment affirmed.

---

[6] Father does not challenge the trial court's subsequent determination that the adoption was in M.R.R.'s best interest.

Brown, J. and Tavitas, J., concur.